# INDIANA/KENTUCKY REGIONAL COUNCIL

## OF THE

## UNITED BROTHERHOOD OF CARPENTERS

## AND JOINERS OF AMERICA

## AND

## NORTHWEST INDIANA CONTRACTORS  ASSOCIATION OF INDIANA, INC.

### LAKE, PORTER, LAPORTE, STARKE, PULASKI,

### NEWTON AND JASPER COUNTIES

### OF INDIANA

### EFFECTIVE

### JUNE 1, 2009 TO MAY 31, 2012

# INDEX

**Article**                                                                                     **Page**

**I RECOGNITION**

| | | |
|---|---|---|
| Section 1. | Bargaining Unit | 5 |
| Section 2. | Recognition | 5 |
| Section 3. | Equal Representation | 6 |
| Section 4. | Performance of Work | 6 |

**II UNION SECURITY AND DUES CHECK OFF**

| | | |
|---|---|---|
| Section 1. | Maintenance of Membership | 2 |
| Section 2. | Discharge | 6 |
| Section 3. | Dues & Assessment Check Off | 6 |
| Section 4. | Indemnity | 7 |
| Section 5. | Federal Law | 7 |

**III WAGES, FRINGES & INDUSTRY FUND**

| | | |
|---|---|---|
| Section 1. | Wages, Savings Fund and Dues Assessment | 7 |
| Section 2. | Millman's Rate | 8 |
| Section 3. | Fringe Contributions and Deductions by Employer | 8 |
| Section 4. | Industry Fund | 9 |
| Section 5. | BCRC Contract Language | 9 |
| Section 6. | Payment of Funds | 10 |
| Section 7. | Cash or Bond Deposit by Employer | 10 |
| Section 8. | Payroll Audits | 11 |
| Section 9. | Delinquencies in Payments | 12 |
| Section 10. | National Health Insurance/Universal Coverage | 14 |
| Section 11. | Family and Medical Leave Act | 15 |

**IV HOURS OF WORK, OVERTIME, SHIFT WORK AND PAYMENT OF WAGES**

| | | |
|---|---|---|
| Section 1. | Regular Work Day | 15 |
| Section 2. | Work Week | 15 |
| Section 3. | Hours of Work | 15 |
| Section 4. | Adjusted Work Day | 15 |
| Section 5. | Overtime Payment | 16 |
| Section 6. | No Work on Labor Day | 16 |
| Section 7. | Payment of Wages | 16 |
| Section 8. | Report for Work Pay | 17 |
| Section 9. | Lay Off or Discharge | 17 |
| Section 10. | Working Time | 18 |

## INDEX

**Article**                                                          **Page**

Section 11.   Shifts, Special Work Hours                               18
Section 12.   Shift-Work Rates                                         19

**V  GENERAL WORKING CONDITION**

Section 1.    Working Foreman                                          20
Section 2.    Piece Work                                               20
Section 3.    Work Limitation                                          20
Section 4.    Repairing Tools                                          20
Section 5.    No Furnishing of Certain Items                           20
Section 6     Employer Working                                         20
Section 7.    Work of a Particular Variety                             20
Section 8.    Suitable Facilities                                      20
Section 9.    Deductions for Contributions                             21
Section 10    Lunch Periods                                            21
Section 11    Insurance Coverage                                       21
Section 12.   Access to Premises                                       21
Section 13.   Stewards                                                 21
Section 14.   Visiting Doctor Without Loss of Time                     22
Section 15.   Tool Loss                                                22
Section 16.   Special Premium                                          22
Section 17.   Safety Enforcement                                       22
Section 18.   Unsafe Employees                                         23
Section 19.   Concrete Pouring                                         23
Section 20.   Transportation                                           23

**VI  PILE DRIVERS**

Section 1.    Pile Driving Crew                                        23
Section 2.    Piling                                                   23
Section 3.    One Rig at a time                                        24

**VII  APPRENTICES**

Section 1.    Probation Period                                         24
Section 2.    Wages                                                    24
Section 3.    Ratio                                                    24
Section 4.    Rotation of Apprentice                                   24

# INDEX

| Article | | Page |
|---|---|---|
| Section 5. | Joint Apprentice Training Committee | 24 |
| **VIII NO DISCRIMINATION - EQUAL BENEFITS-EQUAL OBLIGATION** | | |
| Section 1. | Membership in Union Not Compulsory | 25 |
| Section 2. | Equal Obligation to Contribute | 25 |
| Section 3. | Service Requirement | 25 |
| **IX HIRING AND NOTICE** | | |
| Section 1. | Responsibility for Hiring | 25 |
| Section 2. | No Obligation to Refer | 26 |
| Section 3. | Legal Authorization | 26 |
| Section 4. | Procedure | 26 |
| Section 5. | Severability and Invalidity | 26 |
| **X SCOPE** | | |
| Section 1. | Territorial | 27 |
| Section 2. | Occupational | 27 |
| Section 3. | ............................... | 27 |
| Section 4. | ............................... | 27 |
| **XI PROTECTION OF PREVAILING WAGES, CONDITIONS & OF UNIT WORK** | | |
| Section 1. | Application | 29 |
| Section 2. | Scope of Foregoing | 29 |
| Section 3. | Subcontracting - Unit Work | 29 |
| Section 4. | The Union Shall be Notified | 29 |
| Section 5. | Subcontracting - Non Unit Work | 29 |
| Section 6. | Consistency with Federal Law | 30 |
| **XII ADJUSTMENTS OF DISPUTES** | | **30** |
| **XIII ENTIRE AGREEMENT OF THE PARTIES** | | **31** |
| **XIV INVALIDITY AND SEVERABILITY** | | **32** |
| **XV DURATION, AMENDMENT AND TERMINATIONS** | | **32** |
| Section 1. | Term | 32 |
| Section 2. | Notice to Amend or Terminate | 32 |
| Section 3. | Mutual Amendment at Any Time | 32 |
| Section 4. | Reopeners | 32 |

# CARPENTERS
# COLLECTIVE BARGAINING AGREEMENT

**THIS AGREEMENT** made and entered into this 1st day of June, 2009, by and between the **NORTHWEST INDIANA CONTRACTORS ASSOCIATION OF INDIANA, INC.**, hereinafter referred to as the "ASSOCIATIONS", first party, and the Indiana/Kentucky Regional Council of the United Brotherhood of Carpenters and Joiners of America, Northwest Region, hereinafter referred to as the "UNION", second party.

Reference herein to the ASSOCIATIONS shall be designated as "ASSOCIATIONS" and to any individual employer as "EMPLOYER". This Agreement is made by the ASSOCIATIONS on behalf of the EMPLOYERS they represent.

## PREAMBLE AND DECLARATION OF PRINCIPLES

The members of the ASSOCIATIONS and all other EMPLOYERS who become signatory to this AGREEMENT are engaged primarily in the Building and Construction Industry, and as such, the members of the ASSOCIATIONS, EMPLOYERS, and the UNION have a common interest in same. All the EMPLOYERS and the UNION hereby pledge themselves to the highest degree of harmony and good faith in the performance of the AGREEMENT. All the EMPLOYERS being in the Building and Construction Industry, excellence and safety of endeavor are prime requisites to the continuation and success of the EMPLOYER'S business.

NOW THEREFORE, it is hereby AGREED as follows:

## ARTICLE I
## RECOGNITION

**Section 1. BARGAINING UNIT.** The Bargaining Unit shall be comprised of all Employees engaged in the work described in Section 2 and 3 of Article X hereof. The territory covered by this AGREEMENT is as described in Sections 1, 2 and 3 of Article X.

**Section 2. RECOGNITION.** The ASSOCIATIONS recognize the UNION as the sole and exclusive Section 9(A) of the National Labor Relations Board Act Collective Bargaining Representative for the Employees now or hereafter employed in the Bargaining Unit with respect to wages, hours of work **and** all other terms and conditions of employment, including the administration and application of the AGREEMENT.

**Section 3. EQUAL REPRESENTATION.** The UNION realizes its duty under the National Labor Relations Act, as amended and to the extent that it is the exclusive representative, recognizes that it must represent all Employees in the Bargaining Unit equally, without discrimination, irrespective of membership or non-membership in the UNION.

**Section 4. PERFORMANCE OF WORK BY EMPLOYEES IN THE BARGAINING UNIT.** The Employees in the Bargaining Unit and only such Employees shall perform all of the work covered by this AGREEMENT.

## ARTICLE II
## UNION SECURITY AND DUES CHECK OFF

**Section 1. MAINTENANCE OF MEMBERSHIP.** All Employees who are or become members of the UNION shall maintain their membership in the UNION as a condition of continued employment.

**Section 2. DISCHARGE.** Members of the Union who fail to maintain their membership *in* the Union shall upon request of the UNION be discharged.

**Section 3. DUES & ASSESSMENT CHECK OFF.**

(a) Upon receipt of any Carpenter Employee's written authorization which shall be irrevocable for not more than (1) year or on the termination date of the AGREEMENT, whichever occurs sooner, the EMPLOYER shall deduct from the Carpenter Employee's wages the dues and assessments certified in writing to the EMPLOYER by the UNION, and shall remit same to the account of the Indiana/Kentucky Regional Council of Carpenters, Bank designated by the Union, together with a list of names of Employees from whose pay deductions were made.

(b) Written authorization may be revoked by an Employee by written notice by registered mail to the EMPLOYER and the UNION received by each during the ten (10) day period prior to the end of any authorization year or the applicable COLLECTIVE AGREEMENT, whichever occurs sooner. In the absence of such revocation, sent and received in accordance with the foregoing, the authorization

shall be renewed for additional one (1) year periods or until the end of the COLLECTIVE BARGAINING AGREEMENT, whichever occurs sooner.

Section 4. **INDEMNITY.** The UNION shall defend, indemnify and save the EMPLOYER harmless against any and all claims, demands, suits or other forms of liability that may arise out of or by reason of action taken or not taken by the EMPLOYER for the purpose of complying with the provisions of Section 3 relating to Dues and Assessment.

Section 5. **FEDERAL LAW.** The provisions of this Article shall be interpreted in a fashion consistent with federal law.


## ARTICLE III
## WAGES, FRINGES AND INDUSTRY FUND


### Section 1. WAGES, SAVINGS FUND AND DUES AND ASSESSMENT CHECK OFF.

The minimum hourly rate of wages shall be as follows:

(a) Journeyman/Carpenter $ 33.43 per hour (6/1/09 thru 5/31/10).

(b) Working Foreman – 7% per hour above journeyman rate.

(c) Working General Foreman – 10% per hour above journeyman rate.

(d) At the direction of the UNION and with the signed authorization of the Employee, the EMPLOYER shall deduct from the Employee's wages, an amount of $2.00 per hour for savings purposes and transmit same to a depository designated by the UNION, with completed forms supplied by the UNION.

Payments for the amounts so deducted and the completed forms shall be postmarked no later than the 20th of the month following the close of the preceding month.

(e) The current working assessment from gross wages as shall be certified by the Indiana/Kentucky Regional Council of Carpenters from time to time.

(f) Shift Work Rates - Sect. 12, Page 19.

(g) Negotiated Wage Package

6/1/09 thru 5/31/12

$1.00 increase (on benefits)  effective 6/1/09 thru 12/31/09

$.50 increase (on benefits)  effective 1/1/10 thru 5/31/10

$1.70 increase  effective 6/1/10 thru 5/31/11

$1.70 increase  effective 6/1/11 thru 5/31/12

Length of contract thirty-six (36) months with a monetary increase of $1.50 First Year (on Benefit Package) $1.70 Second Year, $1.70 Third Year. All terms and conditions of this contract to be retroactive of June 1, 2009.

(h) The UNION shall notify the ASSOCIATIONS at least fourteen (14) days prior to each anniversary date how the negotiated wage package shall be allocated.

**Section 2. MILLMAN'S RATE.** The millman's rate shall be $.20 per hour less than the journeyman's rate in Section 1 above. Millman assigned to work away from the mill shall receive the journeyman rate shown in Section 1 on the preceding page.

### Section 3. FRINGE CONTRIBUTIONS AND DEDUCTIONS BY EMPLOYER.

(a) EMPLOYERS who are not signatory to this AGREEMENT and who sign a Memorandum of Agreement with the UNION which obligates them to contribute to the Fringe Benefit Funds described in this Article will be accepted for participation by the Trustees of those funds. It is understood that no EMPLOYER will be permitted to contribute to such Funds without being a party to a written agreement with the Union.

(b) Each individual EMPLOYER shall pay into the Funds as designated in this section the following amounts for each Employee in the Bargaining Unit (including working foreman, general working foreman, apprentice, transient) for the purpose indicated below, with the exception of Carpenters dues check off, market recovery and the vacation savings plan which shall be deducted from the worker's paycheck. Each payment shall be accompanied by a report. All benefits to be effective JUNE 1, 2006.

(c) Indiana/Kentucky Regional Council of Carpenters Welfare Fund - $6.73 per hour.

(d) Indiana/Kentucky Regional Council of Carpenters Pension Trust Fund – $8.38 per hour.

(e) Indiana/Kentucky Regional Council of Carpenters Joint Apprenticeship and Training Fund - $.40 per hour.

(f) Construction Advancement Foundation (Industry Fund) - $.12 per hour.

(g) Midwest Carpenters and Millwrights Federal Credit Union $2.00 per hour (to be deducted by EMPLOYER).

(h) Carpenter working assessment 3.5% of gross wages to be deducted by EMPLOYER.

(i) BCRC - $.08 per hour contribution.

(j) Journeyman Upgrade - $.10 per hour contribution.

(k) Annuity - $4.38 per hour contribution.

(l) UBCJA Nat. Training Fund - $.10 per hour contribution.

(m) IKRCC COPE $.03 per hour contribution (employee option)

(n) Indiana/Kentucky Regional Council of Carpenters Market Recovery Fund $.15 per hour to be deducted by EMPLOYER.

It is agreed that in the event the Trustees of the Funds outlined in this Section deem an emergency exists and an increase is necessary in a particular fund to continue the same benefits during the term of the Agreement, either party shall have the right upon thirty (30) days written notice to re-negotiate the distribution of money within the wage, fringe benefits and deductions total package to accomplish this adjustment which shall occur on the anniversary date of this Agreement.

### Section 4. INDUSTRY FUND.

(a)    The ASSOCIATIONS have established an Industry Advancement Foundation to be known as the CONSTRUCTION ADVANCEMENT FOUNDATION, which Foundation shall be used to establish and conduct educational programs for the general public, employer members, and others with respect to new techniques, ideas and methods which will improve the industry and increase the contribution that the industry and its employees can make to the community and to carry out such other purposes as may be set forth in the Agreement and Bylaws of the Foundation executed by said ASSOCIATION and said Directors with the purpose and intent to promote, support and improve the interest and common good of the UNION construction contracting industry of the area.

(b)    "The EMPLOYER shall pay to the Construction Advancement Foundation of Northwest Indiana, twelve cents ($.12) for each hour worked by all EMPLOYEES of the EMPLOYER covered by this Agreement or any modification to it. Modifications shall include Presidential Agreements, Project Agreements and the National Maintenance Agreement.    Such payments shall be made monthly in accordance with Section 5, Article (a) Payment of funds on or before the 20th day of the succeeding month."

(c)    No part of the payment shall be used for the purposes other than provided in said Agreement and Bylaws of the Foundation, and no part of such payments, either directly or indirectly shall be used for anti-union activities.

(d)    Payments required to be made to said foundation shall be deemed to be governed by the provisions of this AGREEMENT pertaining to the enforcement as to the collection of other payments required to be made by the EMPLOYER.

### Section 5. BCRC CONTRACT LANGUAGE

(a) Various Employer Associations and the Union are members of Building and Construction Resource Center, Inc. (hereinafter "BCRC"), a non-profit corporation that was formed to provide services in the construction industry, including

9

but not limited to, education and referral services concerning alcohol, drug and other substance abuse, which purposes are more fully defined in the Articles of Incorporation and By-Laws of said BCRC.

(b) Each Employer under this Agreement shall pay to BCRC the amount as specified in the wage and fringe benefits section of the Agreement per hour for each hour worked by each of its employees covered by this Agreement. Each employer is obligated to make such contributions, regardless of whether or not such Employer is a member of BCRC.

(c) Payments required to be made to BCRC shall be deemed to be governed by the provisions of this Agreement pertaining to the collection of the Welfare, and Pension payments required to be made by the Employers and thus, may be enforced in the same manner.

(d) The Board of Directors of BCRC will have full audit authority of the Employer's books and records as they pertain to this contribution. Parties Signatory to this Agreement will abide by the provisions of the BCRC substance abuse program.

### Section 6. PAYMENT OF FUNDS

(a) Payment for all Funds, Foundations, and Wage Deductions shall be on one check payable to the order of the Indiana/Kentucky Regional Council of Carpenters Fringe Benefits Fund submitted to the bank designated by Union.

(b) All Fringe Benefit Funds have been established and maintained in accordance with agreements and declarations of trust and shall be administered in accordance with the requirements of applicable federal laws. The agreements and declarations of trust, as amended or restated from time to time are hereby incorporated into and made a part of this agreement.

### Section 7. CASH OR BOND DEPOSIT BY EMPLOYER.

(a) All EMPLOYERS shall furnish a bond in the amount of $20,000 in a form acceptable to the Indiana/Kentucky Regional Council of Carpenters to insure prompt payment of wages, fringe benefit contributions and deductions as required by this Agreement. In lieu of a bond, an Employer may deposit in escrow the amount of $20,000 in cash, under the terms of which the escrow trustee will pay to the employee, fringe benefit fund or Union such wages, fringe benefit contributions, deductions or dues check-off which the Employer is determined to owe under this Agreement. However, those Employers who have employed Carpenters under this or a predecessor or successor contract during 24 consecutive months and who have made all payments herein required in a timely manner during that period are hereby exempt from furnishing an escrow deposit or bond until such time as they become

10

delinquent as defined in this Article, they then must re-deposit the bond and be treated as a new contractor. The Escrow Trust shall be established by agreement between the Escrowee and the Association. Any Employer depositing cash in escrow shall receive interest earned on the amount of the deposit, after the deduction of the cost of the escrow. Employers required to furnish a cash deposit will have that deposit refunded to them at the end of 24 consecutive months during which all payments were made in a timely manner. The Employer shall sign the Union's Escrow Agreement.

(b) The Escrow Agreement shall provide that an Employer who has ceased all employment within the jurisdiction covered by this Agreement shall receive a refund of the Escrow monies or Bond upon submission of a certified written request and the written certification of the Indiana/Kentucky Regional Council of Carpenters that all employees, wages, fringe benefit contributions, wage deductions, delinquent contributions, and interest owed have been paid.

(c) In the event an Employer does not provide a bond or cash escrow account as required herein, the Union may send a 96 hour written notice to the Employer informing them that all bargaining unit employees will be removed from the Employer's job site until such time as the Employer comes into compliance with this contracted provision. The removed employees will be paid straight time.

### Section 8. PAYROLL AUDITS.

(a) The Trustees of any Fringe Benefit Fund to which the EMPLOYER is obligated to contribute under this AGREEMENT shall have the responsibility and the right to verify the accuracy of an EMPLOYER'S contributions to or deduction for Indiana/Kentucky Regional Council of Carpenters Pension Trust Fund, Indiana Regional Council of Carpenters Joint Apprenticeship Fund, Construction Advancement Foundation Industry Fund, Vacation/Savings Fund, BCRC, Annuity, Welfare, Market Recovery, C.O.P.E., UBC National Training Fund , Journeyman Upgrade, Dues Check-off and/or Working Assessment by performing an audit of the EMPLOYER's payroll records. Such audits shall be performed by the authorized representatives of the Trustees and shall be performed during the EMPLOYER's regular business hours, or at such other time as the EMPLOYER and TRUSTEES shall agree, following ten days written advance notice given to the EMPLOYER. If an audit of an EMPLOYER's payroll discloses a delinquency in any of the above funds, in excess of 5% of the total amount due for any such purposes for the period covered by the audit, the EMPLOYER shall be assessed the costs of the audit, plus any additional expenses incurred in the collection of such delinquent contributions,

including reasonable attorney's fees and court costs. The costs of the audit, when not assessed against the EMPLOYER, shall be shared by the recipients of the contributions, on a proportional basis, based upon the ratio of rates of contributions. Under any circumstances, all delinquencies, interest and liquidated damages shall be promptly paid. However, if the Employer refuses to permit an audit thereby causing the initiation of a lawsuit to force the Employer to permit an audit, then that Employer shall pay for the costs of the audit, plus reasonable fees and costs incurred due to the necessity of filing the lawsuit without regard to whether a delinquency is found.

(b) In the event of a proven delinquency on the part of an EMPLOYER solely for payments to the Vacation/Savings or Dues Check Off to the UNION, then the right to request an audit shall lie with the UNION, who is responsible for enforcement of the payments. In such cases, on notice from the UNION, audits as provided above shall be conducted to determine the delinquencies which are due these accounts.

### Section 9. DELINQUENCIES IN PAYMENTS.

(a) When an EMPLOYER has not posted a bond or becomes delinquent in payment of Wages, Vacation/Savings, Dues Check Off (or working assessment), Welfare, Pension, Annuity, Apprenticeship, Journeyman Upgrade, Market Recovery, BCRC, UBC National Training Fund, C.O.P.E. or Industry Fund, and such delinquency is in excess of the Bond Deposit, it will be left to the discretion of Fund Trustees to have money transferred from the Employer's Escrow deposit for the purpose of paying the EMPLOYER'S delinquencies to said Funds on a proportionate basis, after delinquent Wages, Vacation/Savings, Dues Check Off (or Working Assessment), Market Recovery, C.O.P.E. have been paid.

At the time of the transfer of Funds from the Employer's Escrow Account, a certified letter will be sent to the EMPLOYER and he will be given 96 hours to replenish his Escrow Account deposit to the original amount required. If not replenished in that period of time, work will cease on all jobs until payment is made. If the Employees are removed from the job by the UNION to enforce such payments and penalties, the Employees shall be paid by the delinquent EMPLOYER for all time lost at the straight time hourly rate.

(b) Application of the above procedures will not preclude the UNION from proceeding with other methods to obtain payment of such delinquent payments.

(c) Payments to the Funds are to be computed at the end of each month and must be postmarked no later than the twentieth (20th) of the following month after which time the payments will be considered delinquent. In the event an EMPLOYER fails to make either prompt and timely payment to any Fringe Benefit Fund, or prompt

12

and timely payment of deductions for vacation savings, Carpenters dues check off (or working assessment), C.O.P.E. or Market Recovery in accordance with this AGREEMENT, he shall be assessed interest and liquidated damages, it being understood and agreed that damages resulting from such late payments are substantial, but are difficult, if not impossible to ascertain. The rate of interest and the amount of liquidated damages payable to each Fringe Benefit Fund shall be that which is fixed from time to time by each of the several Board of Trustees. In the case of either vacation savings, Carpenters dues check off (or working assessment), C.O.P.E.or Market Recovery, or if no such interest and liquidated damages are fixed by the Trustees of a Fringe Benefit Fund, the interest on the delinquent amount shall be at the prime rate then in effect at the First National Bank of Chicago or 10% whichever is higher.

If payment is not postmarked by the twentieth (20th) of the month, the EMPLOYER shall be sent a notice of his delinquency and if payment is not received within 96 hours, all Employees will be removed from all EMPLOYER'S jobs by the UNION to enforce such payment and penalties. If the Employees are removed from the job by the UNION to enforce payments and penalties, the Employees shall be paid by the delinquent EMPLOYER for all lost time at the straight time hourly rate.

(d) An Employer shall be deemed to be delinquent to the extent that Vacation Savings, Dues Check Off (or working assessment), Market Recovery, C.O.P.E. Welfare, Pension, Annuity, Journeyman Upgrade, BCRC, UBC National Training Fund, Apprenticeship or Industry Fund payments are not postmarked on or before the twentieth (20th) day of the month following the month in which the work giving rise to the contributions was performed.

(e) With respect to contributions for work performed after the effective date of this contract, Employer Contributions payable to the Welfare, Pension, Annuity, Journeyman Upgrade, Apprenticeship, UBC National Training Fund, BCRC, or Industry Fund ("Funds") shall be credited first to the earliest time period for which a delinquent contribution is owed, irrespective of any allocation of contributions or designation of employees shown on the remittance form which accompanies a particular payment.

(f) Except as hereinafter provided, in the event the Employer is more than 30 days late in paying contributions to the Funds, the Funds shall not be liable for benefit coverage. The Employer shall be liable for the payment of covered expenses or accrued pension credit under the Funds' Plan of Benefits or Pension Plan which were incurred by it's employees during the period of such delinquency.

In addition, if the Employer erroneously contributes on behalf of a former employee after contributions on behalf of that employee are not required by this

contract and if, as a result of such erroneous contributions, the Funds assume liability for benefits for such employee, the Employer agrees to be liable for those benefits. If a Fund pays covered expenses for which the Employer is liable in accordance with the foregoing, the Employer agrees to indemnify that Fund for reimbursement of such benefit payments and the Employer agrees to reimburse and indemnify the Fund for all such benefits which it pays to or on behalf of the EMPLOYER's employees (including reasonable attorney's fees and costs which are incurred by either the Fund or the Union in enforcing this provision), provided, however, that the Employer shall continue to be responsible to the Fund for the payment of all contributions, notwithstanding such reimbursement or indemnifications.

(g) If a disagreement exists as to the EMPLOYER's obligations to contribute on behalf of a particular employee, in such event, if the Employer is later determined to have been liable for the contributions, he shall have no further responsibility for benefits incurred by the employee during the period of protested employment, but if the Employer is later determined not to have been liable for such contributions, the employee for whom the protested contributions were paid shall not be eligible for benefits incurred during such period and the Employer shall receive refund or credit of the protested contributions.

(h) If an EMPLOYER denies the Trustees of any Fund the right to audit their books for discrepancies, as per Article III - Section 7 sub paragraph (a) above, or the UNION the right to audit the books, for discrepancies as per Article II - Section 7 sub paragraph (b) above, the Employees shall be removed by the UNION from an EMPLOYER'S job to enforce the audit after the UNION has been informed by the Trustees of the refusal to allow an audit or in the case of Vacation/Savings, Carpenters dues check off (or working assessment), Market Recovery and C.O.P.E. when the UNION determines. If the Employees are removed from the job by the UNION to enforce the audit, the Employees shall be paid by the EMPLOYER for all lost time at the straight hourly rate.

(i) All costs and other expenses, including reasonable attorney's fees and court costs, incurred by the Union or any Fund in the collection of delinquent amounts shall be assessed against and paid by the delinquent Employer.

### SECTION 10 - NATIONAL HEALTH INSURANCE/UNIVERSAL COVERAGE

If federal legislation is enacted providing for national health insurance or universal health care coverage for employees, the parties agree that they will enter into discussions to determine the impact of such legislation on the health care plan then maintained pursuant to contributions made under this agreement. The parties further agree that in the event such legislation renders continued maintenance of

such health care plan unlawful or impermissible, the parties will enter into negotiations to agree upon a replacement plan which will be consistent with the legislation, provided that such replacement shall not have the effect of increasing the cost to Employers, and provided further that such negotiations shall be limited solely to the foregoing issue, and provided further that all other provisions of the agreement shall remain in full force and effect without amendment for the duration of the agreement.

**SECTION 11 - FAMILY AND MEDICAL LEAVE ACT.** The Employer is required to comply with the Family and Medical Leave Act of 1993 ("FMLA") with respect to employees covered by the Agreement.

Accordingly, the Union and Employer agree that, eligible employees shall be granted unpaid leaves of absence as required under the FMLA, provided: that employees shall not accrue other benefits during such leaves; that the Employer may require certification of serious health conditions and medical necessity; that not withstanding any other provisions of this Agreement to the contrary, the Employer may exercise its discretion with respect to conditions associated with, or that may be placed upon, such leaves to the fullest extent permitted by said statute; and that while any employee is on an FMLA leave, the Employer shall pay to the welfare fund identified and referred to in Article VIII of the Agreement the minimum amount of contribution necessary to maintain the FMLA-required health plan coverage to such employee while on said leave, which amount shall be established annually in an actuarially sound manner by the Trustees of such fund.

## ARTICLE IV
## HOURS OF WORK, OVERTIME, SHIFT WORK
## AND PAYMENT OF WAGES

**Section 1. REGULAR WORK DAY.** Eight hours shall constitute a regular day's work.

**Section 2. WORK WEEK.** The regular work week shall consist of five (5) consecutive days, Monday thru Friday.

**Section 3. HOURS OF WORK.** On a regular work day, the hours of work will be 8:00 A.M. to 4:30 P.M. with one half hour off from 12:00 noon to 12:30 P.M. for lunch.

**Section 4. ADJUSTED WORK DAY.** The regular work day as described above may be adjusted for cause. There shall be one half hour off for lunch four (4) hours after the start of the adjusted work day. The EMPLOYER must receive the

approval of the proper Business Representative of the Regional Council prior to effecting the adjusted work day schedule.

### Section 5. OVERTIME PAYMENT.

(a) All work performed before 8:00 A.M. or after 4:30 P.M. on regular work days and Saturdays or work performed before or after the adjusted work days or work performed between 12:00 noon and 12:30 P.M. on regular work days and on work performed during the lunch period on adjusted work days shall be paid for at the rate of time and 1/2. All work performed on Sundays, and the hereinafter mentioned holidays shall be paid for at the rate of double time. The observed holidays shall be New Years Day, Memorial Day, the Fourth of July, Thanksgiving Day and Christmas Day. When one or more of the aforementioned holidays falls on Sunday, the following Monday shall be recognized as the holiday and any work performed on said following day shall be paid for at the rate of double time. The aforementioned shall apply except where Shift Work has been approved. (refer to Section on Shifts.)

(b) EQUALIZATION OF OVERTIME. When overtime is necessary and agreed to by the UNION, all Employees on the job shall be allowed to work. In the event there is insufficient work for all Employees, then the overtime shall be equally distributed and rotated so that each Employee on the job shall receive his fair and equal share of the overtime work.

(c) Employees working on an overtime job will not be replaced by Employees from another job in order for the overtime work.

**Section 6. NO WORK ON LABOR DAY.** No work shall be performed on Labor Day, except to save life or property and then such work shall be paid for at the rate of double time.

**Section 7. PAYMENT OF WAGES.** The EMPLOYER shall not be allowed to hold back more than three (3) regular work day's pay in order to prepare the payroll. Consistent with this, a regular payday must be established every week and the men paid in their respective jobs during working hours, except Employees who quit of their own accord will be paid on the next regular payday. Employees shall be paid either by EMPLOYER check on a local bank or in currency, no later than quitting time provided that and EMPLOYER whose checks are dishonored shall pay only in currency until such time as determined otherwise. In addition, the EMPLOYEE will be paid by the EMPLOYER any bank charges incurred by the Employee due to the dishonoring of the check or checks. If for any reason the EMPLOYER fails to pay on the regular payday.

Employees shall receive straight time until paid in full. If discharged or laid off, Employees shall be paid in full at once and if any Employee is sent to an off-site

16

office for his pay, one (1) hour shall be added to his pay. The EMPLOYER shall indicate on the pay envelope or statement attached to the check the number of hours worked, the rate of pay per hour and the total gross pay together with an itemized list of deductions.

(b) When EMPLOYEES are laid-off or discharged between the hours of 6:00 P.M. Friday through 8:00 A.M. Monday, because of unscheduled or emergency requirements, the EMPLOYEE will be paid by 11:00 A.M. Monday, unless arrangements are made with the Employer. This in no way will supersede the EMPLOYERS requirement to pay the regular scheduled payday or lay-off as outlined above.

**Section 8. REPORT FOR WORK PAY.** Weather permitting, Employees who report for work but are not put to work due to lack of materials or other causes beyond their control shall receive at least two (2) hours pay. Employees who start work shall be guaranteed four (4) hours work, weather permitting and if they return to work after the first four hours, they shall be guaranteed eight (8) hours work, weather permitting. On premium time days, the foregoing guarantee shall be paid at the premium rate.

(a) In the event of inclement weather, Employees may be requested to wait an hour on their own time. Should the weather become good enough to commence work, Employees will be paid for the hour of waiting time. Every effort shall be made to rotate men who are given inside work during inclement weather.

**Section 9. LAY OFF OR DISCHARGE.** Employees who are laid off or discharged shall be allowed a sufficient amount of time to gather their tools and personal belongings during working hours. Further, if said Employees should be discharged by telephone, telegram, letter or any other means of communication, while he is off the job site, he shall be paid two (2) hours wages to pick up tools and personal belongings.

**Section 9A.** Where there is a tool loss on the job, the Employee shall be reimbursed before lay off or discharge as per Article V, Section 16.

**Section 9B. LAYOFF IS PAYOFF.** A man shall receive all monies due upon layoff. If agreed upon by the representative for the UNION, the layoff checks shall be mailed overnight to the Regional Council Office, 780 Union Street, Hobart, IN 46342. Layoff checks must be received within twenty-four (24) hours of the last day worked. If the EMPLOYER should decide to overnight layoff checks, each employee laid off shall be paid an additional two (2) hours wages. EMPLOYERS who fail to pay within the twenty-four (24) hour period shall pay the employee at the straight time rate four (4) hours per day until he is paid in full.

**Section 10. WORKING TIME.** When an EMPLOYER required Employees to use a time clock or other time checking devices, Employees shall not be required to check out on their own time. When tools are to be checked in or out, it shall be done during working hours.

### Section 11. SHIFT, SPECIAL WORK HOURS, WORK RULES.

(a) There shall be no shift work without the consent of the UNION. Each shift shall work for a period of not less than five (5) consecutive regular working days or five (5) consecutive calendar days. No Employee shall work more than (1) shift.

(b) The EMPLOYER shall apply to the UNION for shift work.

(c) When working two (2) or more shifts and the first shift starts at midnight or prior to eight (8:00) A.M., the night shift rate shall apply to the first seven (7) hours work.

(d) If the second shift starts at any time other than eight (8:00) A.M., the Employees shall receive the night shift rate for the first seven (7) hours worked.

(e) The third shift shall start at the end of the second shift and the night shift rate shall apply for the first seven (7) hours worked.

(f) If the first or second shift starts at eight (8:00) A.M., the Employees shall receive the day shift rate for the first eight (8) hours worked.

(g) If the shift work overtime is agreed to by the UNION, each Employee shall receive premium rate his regular shift rate for all work performed before or after his regular shift hours; work performed between midnight FRIDAY and midnight SUNDAY and work performed on the HOLIDAYS recognized in this AGREEMENT or on the days celebrated or observed as such shall be paid either time and a half or double time as per Agreement.

(h) The shift work lunch period shall be thirty (30) minutes immediately following the first four regular shift hours.

(i) Each Employee working more than ten (10) hours shall be allowed reasonable *time* to have the second lunch without any loss of pay between the ninth (9th) and the tenth (10th) hour.

(j) SPECIAL WORK HOURS. The EMPLOYER shall apply to the UNION for special work hours:

1. When special hours are agreed to by the UNION and more than ten (10) hours are worked on any job, the regular lunch period shall be thirty (30) minutes immediately following the first four (4) hours. Each Employee shall be allowed reasonable time to have another lunch without any loss of pay between the ninth (9th) and tenth (10th) hours.

2. Work performed between eight (8:00) A.M. and four-thirty (4:30) P.M. on regular work days shall be at the regular rate. Work performed before eight (8:00)

18

A.M. and after four-thirty (4:30) P.M. on regular work days shall be at time + 1/2 the regular rate.

### Section 12. SHIFT WORK RATES
**6/1/09 through 5/31/10**

|  | 1st or<br>Day Shift | 2nd or 3rd<br>Night Shift |
|---|---|---|
| Journeyman Carpenter | $ 33.43 | $ 38.20 |
| Carpenter Foreman | $ 35.77 | $ 40.87 |
| Gen. Carpenter Foreman | $ 36.77 | $ 42.02 |

**6/1/10 through 5/31/11**

|  | 1st or<br>Day Shift | 2nd or 3rd<br>Night Shift |
|---|---|---|
| Journeyman Carpenter | $_____hr | $_____hr |
| Carpenter Foreman | $_____hr | $_____hr |
| Gen. Carpenter Foreman | $_____hr | $_____hr |

**6/1/11 through 5/31/12**

|  | 1st or<br>Day Shift | 2nd or 3rd<br>Night Shift |
|---|---|---|
| Journeyman Carpenter | $_____hr | $_____hr |
| Carpenter Foreman | $_____hr | $_____hr |
| Gen. Carpenter Foreman | $_____hr | $_____hr |

APPRENTICES - WAGES PAID TO APPRENTICES SHALL BE AT THE APPROVED PERCENTAGE OF THE ABOVE RATES FOR THE RESPECTIVE SHIFTS.

## ARTICLE V
## GENERAL WORKING CONDITIONS

**Section 1. WORKING FOREMAN.** Where five (5) or more Employees in the BARGAINING UNIT are employed on a job, one shall be selected by the Employer to act as a Working Foreman. Additionally there shall be the following Working Foremen when the following number of Employees are employed per job:

17 Men - 2 Working Foremen
32 Men - 3 Working Foremen
48 Men - 4 Working Foremen

One Working Foreman per 8 men thereafter. Where twenty (20) or more men are employed on a job, one of the Working Foreman shall be a Working General Foreman. No more than one Working General Foreman will be required.

The rate of pay and overtime pay for Working Foremen and Working General Foreman shall be calculated on top of the highest rate actually received by the journeymen being led by the particular Foreman. Such individual or individuals shall have no authority to, nor shall they exercise any of the functions customarily exercised by Supervisors as defined in the National Labor Relations Act, as amended nor shall they in any way be deemed to be an Agent of the UNION.

**Section 2. PIECE WORK.** There shall be no piece work of any description or rushing on the job.

**Section 3. WORK LIMITATION.** There shall be no limitation placed on the amount of work to be performed by any workman during working hours.

**Section 4. REPAIRING TOOLS.** No Employee shall be required to file, repair or grind his tools on his own time.

**Section 5. NO FURNISHING OF CERTAIN ITEMS.** No Employee shall furnish a sledge hammer, spike maul, patented miter-box, any lever over 36 inches long, any wrench over 12 inches long, any kind of power tools, foot adz, cross cut saw, sawhorses, ladders, any type of scaffolding materials; nor shall any Employee use their own car or truck or lease same to haul an EMPLOYER'S material or equipment.

**Section 6. EMPLOYER WORKING.** One member of an EMPLOYER firm shall be permitted to work with tools provided the EMPLOYER employs two or more Journeymen covered by this AGREEMENT.

**Section 7. WORK OF A PARTICULAR VARIETY.** Millmen performing work of a particular variety, such as work in mills, shall confine themselves to such particular line of work and not perform outside carpentry work for less than the regular scale of wages.

**Section 8. SUITABLE FACILITIES.** The EMPLOYER shall be required to furnish the following items:

(a) Suitable drinking water in a sanitary container (ice water when the temperature is 70 degrees or higher) and cups.

(b) A room or change house, or space within a room or change house, of suitable size for carpenters for storing their personal tools, changing clothes, having lunches, said room or change house to be heated, equipped with two (2) accessible doors, lighting and benches and tables. This facility should be capable of being locked during non-working hours.

1. No piece of equipment or any type of container containing flammable liquids shall be stored in the same room used by Employees to change their clothes.

2. EMPLOYERS shall be required to replace work clothing in the event same is damaged by fire so long as said clothing is in the change house or gang box provided by the EMPLOYER.

3. Toilets of a clean, sanitary and decent nature shall be furnished for the use of Employees. When sewer or septic tank facilities are not available, chemical toilets and proper sanitary equipment to maintain and use them shall be provided.

4. Suitable facilities of sufficient size and accessibility for the safe operation of stationary power saws and/or other stationary power tools used by the carpenters shall be provided. When using stationary power saws or other stationary power tools and a second man is required he shall be a Journeyman carpenter or not less than a second year apprentice carpenter.

**Section 9. DEDUCTIONS FOR CONTRIBUTIONS.** There shall be no deductions from Employees' wages for contributions of any kind without prior **UNION** approval and no Employee shall be intimidated or solicited in order to authorize deductions for contributions from his wages.

**Section 10. LUNCH PERIODS.** See Article IV, Sec. 3, 4, 5 and 11.

**Section 11. INSURANCE COVERAGE.** For all Employees covered by this AGREEMENT, the EMPLOYER shall carry Worker's Compensation Insurance with an approved company authorized to do business in the State of Indiana and shall in addition contribute to the Indiana State Employment Security Division irrespective of the number of Employees employed. The EMPLOYER shall furnish satisfactory proof of such coverage and contributions to the UNION.

**Section 12. ACCESS TO PREMISES.** The duly authorized Business Representative of the UNION shall be permitted to visit all jobs, subject to the owner's permission, but will in no way interfere with the progress of the work.

**Section 13. STEWARDS.** The UNION shall have the right to appoint its own Steward or Stewards without interference from the EMPLOYER, said Steward or Stewards to be employed on the job at all times when work covered by this AGREEMENT is being performed; any deviation of the foregoing shall be mutually agreed to by both UNION and EMPLOYER. In no case shall the Steward be discharged because he acted in that capacity. In the event a Steward is laid off and his activities on behalf of the UNION are found to be the cause, he shall be reinstated in the same capacity with back pay.

Stewards shall be allowed reasonable and sufficient time to see that this AGREEMENT is being lived up to. The Steward's authority shall be limited to seeing that this AGREEMENT is being lived up to and to enforcing safety conditions as

21

provided in Section 18 of this Article. He shall have no authority relative to hiring, firing, or tenure of employment. The Steward shall promptly take care of injured workers and accompany them to their home, or to the hospital, as the case may require, without loss of time, and the Steward shall also ascertain that the injured member's tools, properties and personal belongings are properly protected. Any Steward found guilty of violation of the existing contract can be discharged for cause.

**Section 14. VISITING DOCTOR WITHOUT LOSS OF TIME.**

(a)  When an Employee is injured on the job, he shall, after receiving emergency treatment, visit a doctor and/or hospital approved by the EMPLOYER'S Insurance Carrier in accordance with the Worker's Compensation Law of the State of Indiana.

(b)  Employees injured on the job and working shall be allowed to visit an approved doctor, as required on company time without loss of time.

(c)  An Employee injured on the job shall receive a full day's wages if sent home under doctor's orders. The EMPLOYER shall provide the Employee with transportation to the hospital or local place of residence on the day of accident.

**Section 15. TOOL LOSS.** When it is necessary to store Employee tools on the jobsite during his non-working hours, the EMPLOYER shall be responsible for loss due to fire or burglary, to the EMPLOYERS storage facility, at 70% of cost to a maximum payment of $325. It shall be the responsibility of the Employees when storing tools, to furnish a list in duplicate to the EMPLOYER to obtain this protection.

**Section 16. SPECIAL PREMIUM.** Employees working with material treated with creosote, other chemicals or toxins injurious to the person or clothing shall receive an additional thirty-five cents ($.35) per hour for straight time work and seventy cents ($.70) per hour for overtime work. The same additional premium shall be applicable to all work performed on open structures, scaffolds, towers, elevators, slip form construction, or the erection, repair, alteration or dismantling of same, when such work occurs at an elevation of forty-eight (48') feet or higher than the shortest distance from the base of the scaffold to the edge of the roof deck. (Any roof with more than a one and one-half (1 1/2) inch rise to the foot shall not be considered a flat roof.)

**Section 17. SAFETY ENFORCEMENT.** The Stewards on all jobs shall have the power to enforce the rectifying of any unsafe conditions, including, but not limited to, unsafe scaffolds, scaffolds without railing over fourteen (14') feet high, open holes that do not have the proper barricades, carrying loads over the heads of men, unclean lumber with nails which has not been made properly safe or any unsafe conditions brought to the Steward's attention. Employees shall not be required to

assume any undue risk or work under unsafe conditions in hazardous places. In the event the EMPLOYER fails to take the proper steps to safeguard the Employees employed, the UNION shall have the power to order the Employees to cease work.

(a)   There shall be a periodic tool box, shanty or standup safety meeting between the Supervision and the Employees.

(b)   All welding shall be performed in a safe manner.

(c) All ladders shall be used in accordance with applicable safety codes.

**Section 18.  UNSAFE EMPLOYEES.** No Employee shall show up for or stay on any job when under the influence of alcohol or drugs.  Any employee found under the influence of alcohol or drugs shall be sent home immediately, without pay.  The Steward shall be notified immediately of this action.

**Section 29.  CONCRETE POURING.** There shall be one or more carpenters employed on the maintenance of forms, anchor bolts and embedded iron (when fastened to forms) while concrete is being poured (if job warrants same).

**Section 20.  TRANSPORTATION.**  In all plant construction the EMPLOYER shall furnish transportation which provides shelter from inclement weather from the gate to the jobsite and back to the gate.  Transportation shall have benches to sit on for safety reasons.

## ARTICLE VI
## PILE DRIVERS

**Section 1. PILE DRIVING CREW.** A pile driving crew shall consist of a minimum of one (1) Working Foreman and Three (3) Journeymen / Apprentice. When two (2) or more crews are working on a job, there shall be a General pile driving Working Foreman.  No pile driving Working Foreman or General Working Foreman shall at the same time work in any other capacity on the same job. Crew size may be adjusted by mutual agreement between UNION and EMPLOYER.

**Section 2. PILING.** All labor employed in unloading, loading and/or handling, whether used or stored, framing, driving, fastening, pulling, cutting, capping of piling of every kind, including splicing, barking, heading, shoeing, rafting, boring, reeving, dodging, whaling, casing, jetting and bracing shall be done by pile drivers.

All burning and welding on pilings, all rigging and signaling in connection therewith shall be done by pile drivers.  Whenever a pile driver takes the place of a diver, he shall be paid the rate of a diver in this locality.  The servicing and repairing, assembling and dismantling of all pile driving equipment shall be done by the pile driving Employees in the Bargaining Unit.

23

**Section 3. ONE RIG AT A TIME.** No single pile driving crew shall work more than one (1) rig at a time.

**ARTICLE VII**
**APPRENTICES**

**Section 1. PROBATION PERIOD**. Each accepted applicant shall be required to serve a ninety day probation period prior to being accepted into the program. The rate of pay for this period shall be 45% of the Journeyman's scale.

**Section 2. WAGES.** The wages of an Apprentice shall be based upon the following percentage of the Journeyman's scale as determined by the Joint Apprentice Committee.

| | | | |
|---|---|---|---|
| First Year | 55% | Third Year | 75% |
| Second Year | 65% | Fourth Year | 85% |

EMPLOYERS shall contact the Apprentice Coordinator and the appropriate Business Representative responsible for the placement and wage rate of Apprentices.

**Section 3. RATIO.** There shall be a minimum of one apprentice and a maximum of two apprentices (if available) per foreman, to be determined by the Business Representative, if at least four journeymen are employed, with consideration being given to training opportunities as to be determined by said Apprenticeship Committee.

Any Employer employing four journeymen must employ one Apprentice if available.

**Section 4. ROTATION OF APPRENTICE.** It shall be the Apprentice Coordinator's responsibility and authority to rotate Apprentices to insure that all Apprentices receive on the job training in all facets of the Carpenter trade.

First and Second year Apprentices will work primarily in the Residential field if such work is available.

**Section 5. JOINT APPRENTICE TRAINING COMMITTEE.** The Associations and the Union have established a Joint Apprentice Training Committee which shall govern the administration of the Apprentice Program through the office of the Director. Each EMPLOYER shall be bound by the determinations of said Committee and shall be required to follow such determinations. Only the Joint Apprentice Committee shall have the powers to up-date, change time required and admitting procedures of the program.

## ARTICLE VIII
## NO DISCRIMINATION
## EQUAL BENEFITS - EQUAL OBLIGATION

**Section 1. MEMBERSHIP IN UNION NOT COMPULSORY.** Joining the UNION is not compulsory. Neither party shall exert any pressure on or discriminate against an Employee as regards such matter.

**Section 2. EQUAL OBLIGATION TO CONTRIBUTE.** Membership in the UNION is separate, apart and distinct from the assumption by one of his equal obligation to the extent that he receives equal benefits. The UNION is required under this AGREEMENT to represent all of the Bargaining Unit fairly and equally without regard to whether or not an Employee is a member of the UNION. The terms of the AGREEMENT have been made for all Employees in the Bargaining Unit and not only for members in the UNION. This AGREEMENT has been executed by the EMPLOYER after it has satisfied itself that the UNION is the choice of a majority of the Employees in the Bargaining Unit or as the result of the pre-hire recognition contained herein and entered into in accordance with Section 8 (f) of the National Labor Relations Act, as amended. Accordingly, it is fair that each Employee in the Bargaining Unit, pay his own way and assume his fair share of the obligation along with the grant of equal benefits contained in this AGREEMENT.

**Section 3. SERVICE REQUIREMENT.** In accordance with the policy set forth under Sections 1 and 2 of this Article, all Employees shall as a condition of continued employment, pay the UNION, the Employee's exclusive collective Bargaining Representative, an amount of money equal to that paid by other Employees in the Bargaining Unit who are members of the UNION, which shall be limited to an amount of money equal to the UNION's regular and usual initiation fees and its regular and usual dues. For existing Employees, such payment shall commence seven (7) days following the day of execution of this AGREEMENT and for new Employees, the payment shall start seven (7) days following the date of employment.

## ARTICLE IX
## HIRING AND NOTICE

**Section 1. RESPONSIBILITY FOR HIRING.** The EMPLOYER shall have the sole and exclusive responsibility for hiring and may hire from any source it desires without paying heed to membership in the UNION or referral or clearance therefrom.

**Section 2. NO OBLIGATION TO REFER.** The UNION shall have no obligation to refer prospective Employees to the EMPLOYER but may do so if it desires.

**Section 3. LEGAL AUTHORIZATION.** The EMPLOYER is exclusively engaged in the Building and Construction Industry. The parties have elected to come under the provisions of Section 8 (f) part 3 of the National Labor Relations Act as amended, which permits that parties to make an AGREEMENT requiring the EMPLOYER to:

(a) Notify the UNION of opportunities for employment; and

(b) Give the UNION an opportunity to refer qualified applicants for employment.

(c) The UNION will send no Employee to the EMPLOYER who they know does not comply with the residency requirements of the Immigration and Reform Act.

**Section 4. PROCEDURE.** In the application and administration of Section 3 of this Article the following shall govern:

(a) The EMPLOYER shall advise the UNION of all available openings and job requirements at least twenty-four (24) hours prior to the EMPLOYER's fulfilling such job requirements.

(b) If the UNION or EMPLOYER elects, a prejob conference prior to commencement of work shall be held. At the prejob conference the EMPLOYER shall advise the UNION of its requirements as to the craft persons required in the respective classifications, the probable starting date, duration of the job and the working schedules.

(c) The UNION shall be given an opportunity to refer qualified applicants for employment.

(d) Persons so referred shall not be given preference or priority by the EMPLOYER over non-referred persons and the EMPLOYER shall have the sole and exclusive right of accepting or rejecting the person so referred.

(e) Nothing herein shall prohibit the EMPLOYER from hiring or recruiting workers from any source it desires.

**Section 5. SEVERABILITY AND INVALIDITY.** It is the intention of the parties hereto to comply with the provision of the National Labor Relations Act, as amended, and in the event this Article is declared to be unlawful, then it shall become inoperative and void and the parties shall immediately meet to negotiate a legal mutually acceptable substitute. The other legal provisions of this AGREEMENT shall not be affected thereby.

# ARTICLE X
## SCOPE

**Section 1. TERRITORIAL.** The territory of area covered by this AGREEMENT shall consist of Lake, Porter, LaPorte, Starke, Newton, Pulaski and Jasper Counties of Indiana.

**Section 2. OCCUPATIONAL.** The trade autonomy of the United Brotherhood of Carpenters and Joiners of America consists of the milling, fashioning, joining, assembling, erecting, fastening, or dismantling of all material of wood, hollow metal or fiber, the laying of all cork and compositions, asphalt floors, all shingles and siding, the manufacturing of all wood materials and the fabrication of all materials where the skill, knowledge and training of a carpenter is required, either through the operation of machine or hand tools: Carpenters, pile drivers, bridge, dock and wharf carpenters, underpinners and timbermen; shipwrights, boat builders, ship carpenters, joiners and caulkers; cabinet makers, bench hands, stair builders, millmen; floor layers and finishers, shinglers, shores and house movers; loggers; lumber and saw mill workers; box makers, railroad carpenters and car builders; or all those engaged in the operation of machinery required in the fashioning or milling of products used in the trade, or engaged as the helpers to any of the above divisions or sub-divisions or the handling of material on any of the above divisions or sub-divisions.

**Section 3.** It is agreed that the jurisdiction or work covered by the AGREEMENT is that provided for in the Charter Grant issued by the United Brotherhood of Carpenters and Joiners of America to the Indiana/Kentucky Regional Council of the United Brotherhood of Carpenters and Joiners of America. It being understood that the claims are subject to local trade agreements and final decisions of AFL & CIO as settlement of jurisdictional disputes.

**Section 4.** This AGREEMENT shall cover and include but not be limited to:

The milling, fashioning, joining, assembling, erecting, fastening or dismantling of all materials of wood, plastic, metal, fiber, cork and composition and all other substitute materials. The building and setting of forms and centers for brick masonry. The fabrication and erection of concrete forms, and the dismantling of same except for materials that are not to be reused. The setting of bulkheads, the setting and fabrication of screeds and stakes for concrete floors where the screed is notched or fitted. The setting and dismantling of forms, including handling and signaling where power is used. The making of all anchor bolts and tie rods which are to be fabricated on the job. The fabrication of templates. The placing and leveling of all templates and anchor bolts by hand.

The bracing of any means of templates and anchor bolts. The setting and aligning of all curb angles when they are attached to a form or bulkhead. The framing, rigging and dismantling in connection with metal column and gang forms. The making of forms for concrete blocks, figures, posts, railings, balusters, ornaments, building construction and heavy construction. The handling of rough lumber from the designated stock pile. The building and moving of all runways and staging where carpenter tools are used. The construction of all hoists, derricks, mortar boards, boxes and trestles made of wood. The cutting or framing of openings for pipes, conduits, ducts, etc., where they pass through floors, partitions, walls, roofs and forms composed in whole or in part of wood. The making and installing of all crippling, bracing, joists, drywall and acoustic tile ceilings. The installation of all furring for ceilings and sidewalls. The installation of all kalamein, hollow metal, wood and plastic laminate doors, walk-in man doors, transoms and windows, scaffolds over fourteen (14') feet in height or any special designed scaffolds or those built for special purposes shall be erected and dismantled from the base by carpenters. The handling of fixtures and cabinets from the delivery truck. The unloading, handling and setting of all fixtures uncrated jambs, doors, bucks and window frames of wood or metal. The installation of all casing, base, molding, chair rail and wainscoting.

They layout, installation and erection of wooden stairs and the jobsite fabrication of same. The installation of fixtures, cabinets, shelving, racks and door louvers and the jobsite fabrication of same. The jobsite mortising and application of hardware in connection with carpentry work. The assembly and setting of all theater type seats, bleachers and gym equipment. The installation of screens, storm sash, storm doors, garage doors, weather stripping, blinds, drape rods, wood plastic or metal window awnings, door shelters and jalousies and the jobsite fabrication of the above items. The installation of drywall materials including plasterboard, asbestos board, transite and composition boards. The application of all drywall materials which serve as a base for acoustic tile. The jobsite construction and setting of all wooden barricades. The installation of insulation material used for sound or weatherproofing. The installation of chalk boards. The operation of hand winches used to raise wooden structures. The sharpening of carpenters hand or power tools. The installation, sanding and finishing of wood floors. The installation of carpeting, padding and tackless stripping. The installation of all resilient floor and tile set with mastic. The installation and application of nailed down asphalt fiber expansion material. The installation of water seal. The installation of key ways. The stripping of key ways attached to water seal and key ways that are to be reused. The burning, welding, power or hand rigging and the use of any instrument or tool for layout work incidental to the carpenter's trade.

28

The realignment of anchor bolts for mechanical equipment set by Millwrights shall be done by the United Brotherhood.

The parties to this AGREEMENT are subject to and agreed to be bound by all decisions and awards made by the Impartial Jurisdictional Disputes Board or its successor agency.

## ARTICLE XI
## PROTECTION OF PREVAILING WAGES,
## CONDITIONS AND OF UNIT WORK

**Section 1. APPLICATION.** The EMPLOYER is in the Construction Industry and both parties have elected to come under the provisions applicable to the Construction Industry contained in Section 8 (e) of the National Labor Relations Act, as amended.

**Section 2. SCOPE OF FOREGOING.** Sections 1 and 4 of this Article relate solely to contracting or sub-contracting of work to be done at the site of the construction, alteration, painting or repair of a building, structure or other work.

**Section 3. SUBCONTRACTING - UNIT WORK.** The territorial and occupational jurisdiction of the UNION, as stated in this AGREEMENT, shall be recognized to the end that if the EMPLOYER subcontracts or contracts out such work, he shall do so only to an EMPLOYER who has or will sign a contract with the UNION prior to beginning work on the project site.

**Section 4.** THE UNION SHALL BE NOTIFIED by telephone when the EMPLOYER sub-contracts Carpenter work so the UNION can get such sub-contractors properly bonded prior to the sub-contractors starting the job.

**Section 5. SUBCONTRACTING - NON UNIT WORK.** Work not within the territorial and occupational jurisdiction of the UNION to be done at the site of construction, alteration, painting or repair of a building structure or other work, shall be contracted or sub-contracted only with EMPLOYERS who have a COLLECTIVE BARGAINING AGREEMENT with UNIONS affiliated with the Building Trades Department of the AFL-CIO or with a UNION affiliated with a Building and Construction Trades Council in turn affiliated with the AFL-CIO, provided that the COLLECTIVE BARGAINING AGREEMENT of such affiliated UNION contains no illegal clauses conditioning employment, or continuation thereof, upon membership or illegal clearance or illegal referral from a UNION. This requirement will be in effect where at least three (3) qualified UNION affiliated Subcontractors actively exist within the jurisdictional region of this AGREEMENT to perform the specific work in question

( not including Millwright work ), and therefore providing for fair and competitive pricing of said work.

**Section 6. CONSISTENCY WITH FEDERAL LAW.** All provisions of this Article shall be interpreted, construed and applied in a legal manner consistent with the laws of the United States and not in conflict thereof.

## ARTICLE XII
## ADJUSTMENT OF DISPUTES

**Section 1.** There shall be no cessation of work, as long as this Article and Decision are complied with. With regard to any EMPLOYER, the ASSOCIATIONS shall be the sole interpreter of this AGREEMENT and the EMPLOYER shall be bound by the ASSOCIATION'S interpretation thereof in all instances.

**Section 2.** There shall be a standing Grievance Committee, three (3) of whom shall be members of the ASSOCIATIONS and three (3) selected by the UNION. Both the ASSOCIATIONS and the UNION shall designate not less than three (3) and not more than five (5) alternates to serve in the event it is necessary. The Chairman shall come from the ASSOCIATIONS and the Secretary from the UNION.

**Section 3.** On the fourth (4th) Wednesday of each month, any outstanding grievances will be heard by the committee. If there are no unsettled grievances, there will be no meeting of the committee. By mutual consent, the meeting of the committee can be postponed to any date.

**Section 4.** In the event of any difference or controversy as to the interpretation or application of this AGREEMENT arising between any EMPLOYER and an Employee in the Bargaining Unit, the difference or controversy shall be taken up at once by the representatives of both the UNION and the EMPLOYER who shall endeavor to make a satisfactory settlement.

**Section 5.** If the difference or controversy cannot be settled between the UNION and the EMPLOYER, then the difference or controversy shall be reduced to writing. Such written grievance shall state the facts of the situation in detail and will be sent to the grieved party by certified mail within fifteen (15) days of the alleged difference or controversy.

**Section 6.** If the grieved party receives the certified mail grievance dated not less than ten (10) days prior to the fourth (4th) Wednesday of the month, such grievance will be heard on the fourth (4th) Wednesday of the current month. If ten (10) days does not exist between receipt of the grievance and the fourth (4th)

Wednesday, then the grievance shall be heard on the fourth (4th) Wednesday of the following month.

**Section 7.** The committee shall hear evidence as presented by both the griever and the grievee and endeavor to arrive at a decision based solely on the evidence presented which shall be consistent with the terms and provisions of this AGREEMENT. It shall be sufficient for a majority of the persons deliberating to arrive at a decision. Any decision reached shall be final, binding and conclusive on all parties concerned. The decision shall be rendered within five (5) days of the hearing. Both parties will be notified by certified mail.

**Section 8.** In the event of a deadlock, the grievance shall be referred to an impartial arbitrator. The parties shall agree upon the name of such individual. In the event they cannot, they shall jointly request the American Arbitration Association to submit a list of five (5) recognized arbitrators. By the alternate striking of names, the name of an arbitrator shall be arrived at. Such arbitrator shall make a determination which shall be final, binding and conclusive on all concerned. The cost of the impartial arbitrator shall be borne equally by both the Grievor and the Grievee.

**Section 9.** Time limits contained herein may be extended by mutual written consent of the ASSOCIATIONS and the UNION.

**Section 10.** In the event a grieved Employer does not comply with the Arbitration Award issued by the Grievance Committee or the impartial arbitrator, the Union and/or the Grievance Committee are empowered to file a lawsuit to enforce the Award against that Employer. All costs and other expenses, including reasonable attorney's fees and court costs incurred in enforcing the Award shall be assessed against and paid by the Employer. Further, if the Award includes a monetary remedy, a fine shall automatically be added to the Award if a lawsuit is filed to enforce the Award and the Award is enforced. Such fine shall be equal to 25% of the total amount of money awarded, with a maximum fine of Two Thousand Five Hundred Dollars ($2500) and a minimum fine of Five Hundred Dollars ($500). In the event that the Award does not include an award of money against the Employer, then that Award should automatically have added to it a One Thousand Dollar ($1000) fine if a lawsuit is filed to enforce the Award and the Award is enforced. If an Employer initiates its own lawsuit to set aside an Arbitration Award and is unsuccessful, then, the costs, expenses and fines identified above shall become operative and payable by the Employer.

## ARTICLE XIII
## ENTIRE AGREEMENT OF THE PARTIES

wage and fringe adjustments. The parties will negotiate as promptly as possible following the receipt of the notice and failing in agreement by June 1, 2010 and June 1, 2011, the UNION, by the giving of an additional fifteen (15) days notice in writing, may strike with the remainder of the contract nevertheless remaining intact.

IN WITNESS WHEREOF, the parties have executed this AGREEMENT the 1st day of June, 2009.

NORTHWEST INDIANA CONTRACTORS ASSOCIATION OF INDIANA, Inc.


Mark Grimmer, PRESIDENT


INDIANA/KENTUCKY REGIONAL COUNCIL OF
THE UNITED BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA


DAVID C. THARP
Secretary-Treasurer/Business Manager